UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
MICHAEL FENWICK,                          )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )        Civil Action No. 07-2330 (PLF)
                                          )
UNITED STATES OF AMERICA, *et al.*        )
                                          )
            Defendants.                   )
_____ )


OPINION

            Before the Court is the defendants' motion to dismiss or, in the alternative, for

summary judgment.  In an earlier Opinion and Order, the Court granted in part the defendants'

motion to dismiss.  The Court deferred ruling on the motion for summary judgment, ordering

supplemental briefs and exhibits regarding the potentially preclusive effect on this action of the

plaintiff's juvenile delinquency adjudication in the Superior Court of the District of Columbia.

See Fenwick v. United States, 691 F. Supp. 2d 108 (D.D.C. 2010).  Having carefully considered

the parties' original and supplemental briefing, their exhibits, and the applicable law, the Court

will grant in part and deny in part the defendants' motion.  The bulk of the plaintiff's claims

remain intact.[1]

_____

[1]       The papers considered in connection with this matter include the following:
plaintiff's complaint ("Compl."); defendants' motion to dismiss or, in the alternative, for
summary judgment ("Mot.") and supporting memorandum ("Mem."); plaintiff's opposition
("Opp."); defendants' reply ("Reply"); plaintiff's supplemental memorandum ("Pl.'s Suppl.
Mem."); and defendants' supplemental memorandum ("Defs.' Suppl. Mem.").  In support of
their memoranda of law, both the plaintiff and the defendants have submitted certain exhibits
under seal, at Docket No. 31 ("Pl.'s Sealed Exhibits"); and Docket Nos. 32 & 47 ("Defs.' Sealed
Exhibits").

## I. BACKGROUND

This action arises from an incident in which two Deputy United States Marshals shot and seriously injured the plaintiff, Michael Fenwick — then sixteen years old — as he drove out of a parking lot and failed to heed their orders to stop and speak with them about their suspicions that the vehicle he was driving was stolen.

On January 3, 2007, Mr. Fenwick drove a green Lincoln into the parking lot of an apartment complex in Washington, D.C., parked, and got out of the car. Opp. at 3-4. He walked to the door of his girlfriend's apartment and then, finding that she was not at home, returned to the car. Id. at 4. In the meantime, defendants Deputy Marshals Andrew Pudimott, Jeremy Fischer, and John Mickle ("the deputies") were standing nearby in the parking lot, waiting to enforce an eviction order issued for one of the units in the complex. Id. at 4. The parties' accounts of what happened next diverge widely.

According to the defendants, based on Mr. Fenwick's youthful appearance, his behavior, and the appearance of his car, the deputies developed a reasonable suspicion that Mr. Fenwick was driving a stolen automobile and that he was too young to drive. Mem. at 4. As Mr. Fenwick was standing beside the Lincoln after returning from his girlfriend's apartment, they asked him to stop and speak with them. Id. Although Mr. Fenwick heard their request and pointed to his chest while saying, "Who, me?", he did not stop, but instead got into the car and put it in reverse. Id. He then drove the car forward toward "one or more [of the] deputies" who by then had surrounded the vehicle, placing their lives in danger. Id. at 25. Responding to the "apparent threat to the safety of themselves, fellow officers, and/or possibly other bystanders," Deputies Pudimott and Fischer fired several shots at Mr. Fenwick, id. at 26, before he drove off, leaving the parking lot. Compl. ¶ 38.

Mr. Fenwick, in contrast, claims that after he pointed to himself and said "Who, me?", he did not observe any response on the deputies' part or hear their request to stop and talk with them. Opp. at 5. Not understanding that they wished him to stay in the parking lot, he climbed into his car and began to back out of his parking space. Id. at 6. After pulling out of the space, Mr. Fenwick stopped while he changed gears. Id., Ex. 3 at 3 (Declaration of Michael Fenwick) ("Fenwick Decl."). At that point Deputy Pudimott began shooting at Mr. Fenwick. Deputy Fischer also "fired before [Mr. Fenwick] heard any orders to stop," and "while the car was stopped." Opp. at 12. Once Mr. Fenwick began to drive the car forward, Deputy Fischer fired "at least" one other shot at him "as [Mr. Fenwick] was driving away." Id. at 12. Mr. Fenwick maintains that at no time did the deputies "fear[ ] for their lives," id., and that the deputies "kept shooting at [him] as [he] was driving out of the parking lot." Fenwick Decl. at 3.

Unlike the shooting itself, the events that followed are, for the most part, not in dispute. Although he had been struck by several bullets during the shooting, Mr. Fenwick managed to drive out of the parking lot. Fenwick Decl. at 3. He soon passed his stepfather driving on the same road, flagged him down, and was driven to a hospital for treatment of his injuries. Id. Officers from the Metropolitan Police Department found Mr. Fenwick at the hospital, and the deputies identified him as the person they encountered. Pl.'s Sealed Ex. 6 at 2. Mr. Fenwick was transported by helicopter to Washington Hospital Center, where he underwent emergency surgery and for a time was in critical condition. Id.; Fenwick Decl. at 3.

In February 2007, Mr. Fenwick was charged as a juvenile with, among other things, aggravated assault on a police officer and receipt and conversion of stolen property. Defs.' Sealed Ex. 7 at 2-3. His case was tried before Judge Patricia Broderick in the Family Division of the Superior Court of the District of Columbia. Id. During the trial, Mr. Fenwick's

counsel moved for the exclusion of tangible evidence — photographs of the allegedly stolen car

driven by Mr. Fenwick — on the ground that the evidence had been recovered as a direct result

of the illegal seizure of Mr. Fenwick in violation of the Fourth Amendment.  Defs.' Sealed Ex. 3

at 6.  That seizure, according to counsel, occurred when "the deputies ran over to [the car Mr.

Fenwick was driving] with guns drawn and then shot the driver."  Id. at 5.  Judge Broderick

rejected Mr. Fenwick's motion to suppress, Defs.' Sealed Ex. 1 at 3-6, and in a separate ruling,

she found Mr. Fenwick "guilty/involved" as to one count each of felony assault on a police

officer, receipt of stolen property, and unauthorized use of a vehicle.   The assault count was

based on Mr. Fenwick's having accelerated forward in the vehicle he was driving with Deputy

Pudimott clearly visible near the front of the car, placing the deputy in danger of injury.  Pl.'s

Sealed Ex. 15 at 3-6; Defs.' Sealed Ex. 6 at 5.  The verdict was upheld by the District of

Columbia Court of Appeals, against Mr. Fenwick's challenge that government had not proven

that he created "a grave risk of causing significant bodily injury" to an officer, as required for a

felony conviction under the assault statute.  See Memorandum Opinion and Judgment, In re

M.T.F., No. 07-FS-1150 (D.C. Dec. 2, 2010).

   This action was filed by Mr. Fenwick's mother, Cheryl Fenwick, who served as

the plaintiff in this case until Mr. Fenwick reached the age of majority.  The complaint alleges

that Deputies Fischer, Mickle, and Pudimott violated Mr. Fenwick's rights under the Fourth

Amendment to the Constitution, and that the United States is liable to Mr. Fenwick under the

Federal Tort Claims Act ("FTCA") for acts of assault, battery, and false imprisonment

committed by the deputies in the course of their employment.  Mr. Fenwick seeks $10 million in

compensatory damages and $100 million in punitive damages.

Surveillance video footage taken by security cameras positioned in the vicinity of the incident captured most of the encounter between Mr. Fenwick and the deputies. This video was relied upon by the Superior Court and the District of Columbia Court of Appeals in Mr. Fenwick's juvenile delinquency adjudication, and the parties have provided the video footage to the Court as evidence in this action.

The Court's earlier Opinion addressed issues arising from the plaintiff's failure to properly serve the individual defendants, and it clarified that Mr. Fenwick could not maintain common law claims against those individual defendants but could only pursue recovery from the United States for their conduct under the FTCA. In addition, the Opinion denied the plaintiff's motion to strike the defendants' exhibits that consisted of records from Mr. Fenwick's Superior Court proceedings. Fenwick v. United States, 691 F. Supp. 2d at 112-16. The Court did not rule on the defendants' contention that Mr. Fenwick's claims are barred by res judicata, collateral estoppel, and the doctrine of Heck v. Humphrey, 512 U.S. 477 (1994), because the parties had not adequately briefed the preclusion question or provided the Court with all of the records from Superior Court that it needed to answer that question. Id. at 116-17. The parties have since filed supplemental briefs and exhibits as directed by the Court.

## II.  STANDARD OF REVIEW

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). "A fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." Holcomb v. Powell, 433 F.3d

at 895 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; Holcomb v. Powell, 433 F.3d at 895.  When a motion for summary judgment is under consideration, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255; see also Mastro v. Potomac Electric Power Co., 447 F.3d 843, 849-50 (D.C. Cir. 2006); Aka v. Washington Hospital Center, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc); Washington Post Co. v. U.S. Dep't of Health and Human Services, 865 F.2d 320, 325 (D.C. Cir. 1989).

The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The non-moving party is required to provide evidence that would permit a reasonable jury to find in his favor.  Laningham v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the non-movant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50; see Scott v. Harris, 550 U.S. at 380 ("[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'") (quoting Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  To defeat a properly supported motion for summary judgment, then, the non-moving party must have more than "a scintilla of evidence to support his claims."  Freedman v. MCI Telecommunications Corp., 255 F.3d 840, 845 (D.C. Cir. 2001).

### III.  DISCUSSION

#### A.  Collateral Estoppel (Issue Preclusion)

The defendants maintain that during Mr. Fenwick's juvenile delinquency adjudication in Superior Court he unsuccessfully litigated the same issues that he raises here, and that as a result his claims against the defendants are barred by the related doctrines of res judicata (claim preclusion) and collateral estoppel (issue preclusion).

Res judicata, or claim preclusion, clearly does not apply.  That doctrine bars lawsuits "involving the same claims or cause of action" as an earlier suit.  Porter v. Shah, 606 F.3d 809, 813 (D.C. Cir. 2010).  Mr. Fenwick did not, and could not, bring Bivens or FTCA claims against any defendant during his juvenile delinquency adjudication.  Furthermore, res judicata applies only "between the same parties or their privies."  Id.  Neither the deputies nor the United States were parties to the juvenile proceeding.  Mr. Fenwick's claims therefore are not barred by res judicata, so the only question is whether collateral estoppel, *i.e.*, issue preclusion, limits the matters that he may contest in this action.

"Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."  U.S. Postal Serv. v. Am. Postal Workers Union, 553 F.3d 686, 696 (D.C. Cir. 2009) (quoting Novak v. World Bank, 703 F.2d 1305, 1309 (D.C. Cir. 1983)).  The purpose of the doctrine is to "conserve judicial resources, avoid inconsistent results, engender respect for judgments of predictable and certain effect, and . . . prevent serial forum-shopping and piecemeal litigation."  McGee v. District of Columbia, 646 F. Supp. 2d 115, 123 (D.D.C. 2009) (citation and internal quotation marks omitted).  The Supreme Court has held that "issues actually litigated in a state-court proceeding" — including

criminal prosecutions — "are entitled to the same preclusive effect in a subsequent federal § 1983 suit as they enjoy in the courts of the State where the judgment was rendered." Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 83 (1984) (citing Allen v. McCurry, 449 U.S. 90, 97-99 (1980)).  The only exception is if the party against whom the earlier decision is asserted did not have a "full and fair opportunity" to litigate the issue in the earlier case.  Allen v. McCurry, 449 U.S. at 95.  "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so."  Id. at 96 (citing 28 U.S.C. § 1738).  Allen's holding applies to Bivens actions as well as to Section 1983 actions.  McClam v. Barry, 697 F.2d 366, 371 n.3 (D.C. Cir. 1983), overruled on other grounds by Brown v. United States, 742 F.2d 1498 (D.C. Cir. 1984); Weakes v. FBI-MPD Safe Streets Task Force, Civil Action No. 05-0595, 2006 WL 212141, at *4 (D.D.C. Jan. 27, 2006) (citing McClam v. Barry, 697 F.2d at 371 n.3).

To determine whether a plaintiff's factual or legal contentions are precluded by the results of an earlier state-court proceeding, a federal court must apply the preclusion law of that state.  See Parsons Steel, Inc. v. First Alabama Bank, 474 U.S. 518, 525 (1986); Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. at 87.  In the District of Columbia, "an issue of fact or law" is rendered conclusive in a subsequent action under collateral estoppel when "(1) the issue is actually litigated and (2) determined by a valid, final judgment on the merits; (3) after a full and fair opportunity for litigation by the parties or their privies; (4) under circumstances where the determination was essential to the judgment, and not merely dictum."  Modiri v. 1342 Rest. Group, Inc., 904 A.2d 391, 394 (D.C. 2006) (quoting Davis v. Davis, 663 A.2d 499, 501 (D.C. 1995)).  In other words, collateral estoppel "precludes the relitigation of issues actually litigated and necessary to the outcome of a prior case involving the party against whom estoppel

is asserted[.]"  Carr v. Rose, 701 A.2d 1065, 1076 (D.C. 1997).  "A party raising a claim of

collateral estoppel bears the burden of showing that the present issues are identical to those

adjudicated in a prior proceeding[.]"  Merle v. United States, 683 A.2d 755, 762 (D.C. 1996).

Because "[c]ollateral estoppel may be used defensively to prevent a plaintiff from

relitigating issues which the plaintiff lost previously against another [party] . . . a stranger to the

first action may invoke issue preclusion against a party to that action."  Patton v. Klein, 746 A.2d

866, 871 (D.C. 1999) (quoting Carr v. Rose, 701 A.2d at 1076).  Questions of law or fact

established in a juvenile delinquency proceeding can have preclusive effect in a subsequent civil

action brought against defendants who were not parties to the delinquency proceeding.  Lassiter

v. Dist. of Columbia, 447 A.2d 456, 458-61 (D.C. 1982).

In the defendants' view, all of the issues raised by Mr. Fenwick in this action

were adjudicated in his juvenile delinquency proceeding, and the judgment against him in that

proceeding acts as a complete bar to his claims here.  Mem. at 17-19.  While the Court disagrees

with that assessment, as explained below, it does conclude that certain factual and legal

contentions advanced by Mr. Fenwick in this action were resolved against him in the Superior

Court, creating preclusive effect here.  Although Mr. Fenwick may not relitigate those particular

issues in this Court, that hindrance does not extinguish the viability of his claims against the

defendants.  The Court will take each of Mr. Fenwick's claims in turn.

1.  Bivens Claim for Excessive Force

"To establish a Fourth Amendment violation for excessive use of force by a

police officer, a plaintiff must demonstrate that first, he was seized, and second, that the use of

force applied in the seizure was unreasonable."  Robinson v. Dist. of Columbia, 736 F. Supp. 2d

254, 259 (D.D.C. 2010) (citing Graham v. Connor, 490 U.S. 386, 397 (1989), and Johnson v.

Dist. of Columbia, 528 F.3d 969, 973 (D.C. Cir. 2008)).  A constitutional claim of excessive

force is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard,

which tracks the constitutional text by asking 'whether the force applied was reasonable.'"

Johnson v. District of Columbia, 528 F.3d at 973 (quoting Graham v. Connor, 490 U.S. at 388,

and Wardlaw v. Pickett, 1 F.3d 1297, 1303 (D.C. Cir. 1993)).  Assessing the reasonableness of a

seizure requires giving "careful attention to the facts and circumstances of [the] particular case,

including the severity of the crime at issue, whether the suspect poses an immediate threat to the

safety of the officer or others, and whether he is actively resisting arrest or attempting to evade

arrest by flight."  Id. at 974 (quoting Graham v. Connor, 490 U.S. at 396). [2]

  The Superior Court made two rulings in Mr. Fenwick's juvenile delinquency

proceeding that entailed factual findings and legal conclusions which may have preclusive effect

on Mr. Fenwick's excessive force claims.  Any determinations made by that court are binding

here as long as they were necessary to the judgment and Mr. Fenwick had a full and fair

opportunity to litigate them.  Allen v. McCurry, 449 U.S. at 95; Modiri v. 1342 Rest. Group,

Inc., 904 A.2d at 394.

  First, the court denied a motion by Mr. Fenwick to suppress tangible evidence in

the form of photographs of the Lincoln Mark that he was driving at the time of his encounter

---

[2]  Although Mr. Fenwick eluded capture at the scene of his encounter with the
deputies and was arrested only later at the hospital where he sought emergency treatment for his
injuries, the defendants do not argue that his shooting fails to qualify as a "seizure" under the
Fourth Amendment; indeed, they appear to concede the point.  See Mem. at 25 ("[T]here can be
no question that apprehension by the use of deadly force is a seizure subject to the
reasonableness requirement of the Fourth Amendment.") (quoting Tennessee v. Garner, 471 U.S.
1, 7 (1985)).

with the deputies.  See Defs.' Sealed Ex. 3 ("Mot. to Suppress").[3]  After fleeing the scene of the

shooting and coming across his stepfather driving his own car, Mr. Fenwick left the Lincoln on

the street, got into his stepfather's car, and was taken to the hospital.  The abandoned Lincoln

later was recovered by the police and taken to its crime lab, where it was searched and

photographed pursuant to a search warrant.  Mr. Fenwick sought to suppress all photographs of

the vehicle as the fruits of an illegal seizure.  He argued that when the deputies shot Mr. Fenwick

they lacked the reasonable suspicion that would justify an investigative stop under Terry v. Ohio,

392 U.S. 21 (1968), as well as probable cause for an arrest and justification for the use of deadly

force under Tennessee v. Garner, 471 U.S. 1 (1985).  Mot. to Suppress at 4.  In essence, Mr.

Fenwick's argument was that but for the allegedly illegal seizure that occurred when the

Deputies shot Mr. Fenwick, the police would not have recovered the Lincoln or any evidence

derived therefrom.  Id. at 6.

            In pressing this argument before the Superior Court, Mr. Fenwick contended that

the deputies began shooting at him during the moment at which he had stopped the car after

backing it out of the parking space but *before* he began accelerating forward toward the exit to

the parking lot — the act that, according to the deputies and an eyewitness named Otis Williams,

put Deputy Pudimott in danger of being hit by the vehicle.  Based largely on this proffered

version of the facts, Mr. Fenwick argued as a legal matter that the deputies used constitutionally

excessive force in shooting him because they lacked the necessary justification for such force

under Tennessee v. Garner, and that the excessiveness of this force rendered the resulting search

of the vehicle unlawful.  See Pl.'s Sealed Ex. 12 at 204-205; Defs.' Sealed Ex. 14 at 15-17,

20-25.

---

[3]        These photographs supported the government's charge that the Lincoln was
stolen, showing that the ignition had been removed and covered by a T-shirt, and that the lock to
the car door was damaged.  See Defs.' Sealed Ex. 9 at 3.

Responding to the motion to suppress the photographs of the Lincoln Mark, the District of Columbia advanced several arguments about why the search of the Lincoln was lawful.  On the facts, the District disputed the claim that the deputies started shooting before Mr. Fenwick began accelerating forward in the car, arguing instead that the shooting occurred only after and in response to the dangerous forward acceleration of the car.  Defs.' Sealed Ex. 9 at 2 ("Mot. to Suppress Opp.").  The District also argued that Mr. Fenwick had no standing to challenge the recovery of evidence from the Lincoln because he had abandoned the car, relinquishing any legitimate expectation of privacy that he might have had in its contents.  Mot. to Suppress Opp. at 8; Defs.' Sealed Ex. 11 at 1-2; Defs.' Sealed Ex. 14 at 28.  The District further argued that, regardless of what happened during Mr. Fenwick's confrontation with the deputies, the subsequent search warrant for the Lincoln was valid.  Defs.' Sealed Ex. 14 at 28. None of the District's written or oral submissions addressed whether the deputies used excessive force in shooting Mr. Fenwick, with the exception of steadfastly maintaining that the shooting did not precede Mr. Fenwick's alleged assault.

Judge Broderick heard evidence related to the motion to suppress in tandem with the evidence presented on the merits of the delinquency charges.  She ruled orally on the motion to suppress as follows:

> [W]ith the evidence presented before me, I find the testimony of the officers to be particularly credible and compelling.
>
> The most compelling witness to me is Otis Williams [the lay witness] -- or one of the most compelling -- who I think gave a very frank, truthful and, again, compelling statement of what occurred. And he very clearly stated in his testimony that the shots were fired after the car nearly hit at least two of the officers.
>
> [H]e also stated that when the defendant -- or the respondent drove up, the officers commented on his youth. What I see from the facts that have been presented before me in evidence is that the

defendant -- or the respondent drove up. When he got out of the car, his youth was noted. One of the officers noted the recent damage to the car, which made him suspect. And also one of the other officers noted the broken door lock. And most of them noticed his youth. . . .

So they had someone who they suspected was driving a car with a broken door lock, and looked too young to drive, all of which gave them at least reasonable suspicion, if not probable cause, right then and there.

And so they asked him to stop, which I think they had a perfect right to do, under Terry versus Ohio. They did ask him to stop. He indicated to them, who me, by his gestures. Everyone confirms that action. And when they indicated yes, he continued to get in the car. And in very short order, as the video shows, and as the testimony indicates, the car backed up and began to move.

But my understanding, having gone through the APO statute that's in the Red Book, is that part of the theory here is resisting [an officer], opposing [an officer], et cetera. And so at that point I do have your client resisting and opposing arrest.

So I think that the evidence, as I see it and as I've heard it, is that after the car backed up and then went forward, and it nearly hit two officers while they tried to stop your client -- I don't see or find anything inappropriate in their actions at all.

And I agree with [prosecutor] Leighton's rendition of the fact that there is a search warrant for the contents of the car. And so I also follow his theory of abandonment, and agree with it. So for all of those reasons I deny the motion to suppress the tangible evidence at this time.

Defs.' Sealed Ex. 1 at 3-6.  Contrary to the defendants' argument, in her ruling Judge Broderick

cannot fairly be said to have passed judgment on whether the deputies' shooting of Mr. Fenwick

amounted to constitutionally excessive force.

To begin with, the analysis focused exclusively on whether the deputies had

adequate cause to question Mr. Fenwick and stop him from leaving the parking lot.  The judge

did not address whether shooting Mr. Fenwick was constitutionally permissible under the

circumstances.  Although Mr. Fenwick invited a ruling on that point through one aspect of his

suppression argument — that the excessiveness of the force used by the deputies against Mr.

Fenwick rendered illegal the subsequent search of the Lincoln — Judge Broderick simply did not

engage with that convoluted aspect of the argument.[4]  Instead, she merely rejected Mr.

Fenwick's contention that the deputies lacked the requisite cause under <u>Terry v. Ohio</u> to question

Mr. Fenwick at the scene, making no comment on whether shooting him was a legitimate

response after he ignored the deputies' entreaties and attempted to escape.  The judge's statement

that she did not "see or find anything inappropriate in [the deputies'] actions as all," when read in

the context of the ruling as a whole, does not evince a ruling that firing on Mr. Fenwick was

constitutionally permissible.  The oral ruling contained not so much as a passing mention of the

constitutional requirements for the use of deadly force, much less a discussion of any of the

relevant case law or the factual findings necessary to support a conclusion on that issue.  "An

evaluation of the severity of the police response to [Mr. Fenwick]'s attack was not at issue, and

thus was not adjudicated, in the juvenile proceeding.  It follows that collateral estoppel does not

necessarily bar [his] claim."  <u>Lassiter v. Dist. of Columbia</u>, 447 A.2d at 460.

       Even if the court's ruling on the motion to suppress did constitute a determination

about whether the deputies used constitutionally excessive force against Mr. Fenwick, that

determination was not "essential to the judgment," as required for issue preclusion.  <u>Modiri v.</u>

<u>1342 Rest. Group, Inc.</u>, 904 A.2d at 394.  The government raised several independent arguments

in opposition to the motion, two of which had nothing to do with the legality of the deputies'

conduct, and Judge Broderick explained that she agreed with all of them.  <u>See</u> Defs.' Sealed Ex.

---

[4]      As the District maintained, courts have held that "excessive force in making an arrest or seizure is not a basis for the exclusion of evidence."  <u>Evans v. Poskon</u>, 603 F.3d 362, 364 (7th Cir. 2010).

1 at 5-6 ("And I agree with [the prosecutor's] rendition of the fact that there is a search warrant for the contents of the car.  And so I also follow his theory of abandonment, and agree with it. *So for all of those reasons* I deny the motion to suppress the tangible evidence at this time.") (emphasis added).  Because the government's "search warrant" and "abandonment" arguments were each independently sufficient reasons to deny the motion to suppress, any determination made about the constitutional reasonableness of Mr. Fenwick's shooting was not "necessary to the outcome" of the contested motion.  Carr v. Rose, 701 A.2d at 1076; cf. Connors v. Tanoma Min. Co., Inc., 953 F.2d 682, 685-86 (D.C. Cir. 1992) (where "both arguments pointed toward a judgment for the Alabama producers, [and] the court had no reason to choose between them . . . the precise legal basis upon which the judgment rests is unclear" and "[i]n view of this lingering uncertainty, we cannot say that the producers have discharged their burden of showing that the [earlier decision] 'actually and necessarily' resolved the issue that the trustees have raised in this case").

Finally, the context of the motion to suppress did not provide a "full and fair opportunity" for the litigation of Mr. Fenwick's excessive force claim.  Allen v. McCurry, 449 U.S. at 95; Modiri v. 1342 Rest. Group, Inc., 904 A.2d at 394.  Despite Mr. Fenwick's strained attempt to inject that issue into the suppression determination, the unpersuasiveness of this attempt and the irrelevance of the issue are apparent from the manner in which the government and the court virtually ignored the issue.

Thus, because the excessive force claim was not ruled upon by the Superior Court, because any such ruling would have been dictum, and because Mr. Fenwick lacked a full and fair opportunity to litigate this weighty issue in such an attenuated context, Judge

Broderick's ruling on the motion to suppress does not collaterally estop Mr. Fenwick from

pursuing the issue here.

The second ruling made by the Superior Court with potentially preclusive effect

here was Judge Broderick's determination, after a bench trial, that Mr. Fenwick committed one

count of assault on a police officer ("APO").  Liability on that charge requires that a defendant,

"without justifiable and excusable cause, assaults, resists, opposes, impedes, intimidates, or

interferes with a law enforcement officer on account of, or while that law enforcement officer is

engaged in the performance of his or her official duties."  D.C. Code § 22-405(b).  If the

defendant, while perpetrating this offense, "commits a violent act that creates a grave risk of

causing significant bodily injury to the officer," the defendant is guilty of a felony.  D.C. Code

§ 22-405(c).  In concluding that Mr. Fenwick committed felony APO, Judge Broderick orally

announced her findings as follows:

> As I mentioned in ruling on the motion [to suppress tangible evidence], I did credit the testimony of the officers, and particularly Officers Mickle [and Pudimott]. And also very strong portions of Mr. Williams' testimony were very compelling, and here's how I see the evidence. I see that the defendant drove up, had a little trouble parking, finally reparked the car, got out of the car, walked into the building. The video shows approximately a minute or so later he comes out of the building. At that time he goes to the side of the car.
>
> It's hard to tell what he's doing from the video, but the officers testify, and there's been nothing to suggest that they were incorrect, that he appears to look like he is using the door-lock numbers that are underneath. The officers suggest to him that they'd like to talk with him, and he starts to get into the car. He opens the door and [is] between the door of the car and the car when he points to himself and says, who me?
>
> Now, one of the officers testified that at that point he said you're not in trouble. We just want to talk with you. The defendant chose not to comply. He got into the car. He shut the door. He started the car. He backed up, and at that point the officers rushed towards the

car, and that is the first count of APO that the Government is charging where he backs up and nearly hits [Officer Mickle].

But the officer testified that he was running at the car as the car was backing up and that he pushed off the car, so what I see at this point is I see the defendant choosing not to comply, which, according to the law, he has the right to do particularly because the officers have said that he's not in any trouble. So I don't see . . . any intent to hit the officer or aim at the officer at that time, and so I do not see an APO at that time.

However, [Officer Pudimott] testified that he was towards the front of the car. He first banged on the side window. He couldn't see the defendant, or the respondent, so he leaned over the front of the car and pointed his gun directly at the window and [at] that point he could see the respondent, and there's no reason to believe that at that point the respondent couldn't see him. At that point he chose to drive forward, and it's my belief, both from the video and from the testimony, that it wasn't until the officer was in that position and the car is going forward at him that he got off the car, hit the side-view mirror, and then fired.

So I do see that his actions in going forward, with the officer there and clearly visible, was an APO. It was both an assaultive APO, a resisting APO, an opposing APO, and an interfering APO. As he drove off, I don't see that he in any way aimed towards or resisted or did anything towards Officer Fischer. So I only find one count of assault [on] a police officer in that regard.

Defs.' Sealed Ex. 2 at 4-6.

Neither the verdict on the assault charge, nor Judge Broderick's underlying factual findings, preclude Mr. Fenwick from pursuing claims against the defendants for unconstitutional use of deadly force.  Once again, issue preclusion "applies only to those matters actually raised and adjudicated in the antecedent suit."  Lassiter v. Dist. of Columbia, 447 A.2d at 459.  In finding that Mr. Fenwick committed one count of felony APO, Judge Broderick necessarily determined that he created a grave risk of causing significant bodily injury to Deputy Pudimott when, without justifiable or excusable cause, he drove the car forward in a manner that put the deputy in danger of being hit.  See D.C. Code §§ 22-405(b), (c); Defs.' Sealed Ex. 2 at 6.

17

But Judge Broderick did not decide — and had no need to decide — whether the deputies shot

Mr. Fenwick at a point when they still reasonably believed that Deputy Pudimott was in danger,

or whether they instead fired some or all of their shots after the danger already had passed.

Judge Broderick's own reconstruction of the key moment in the incident, based on the evidence

before her, suggests that Deputy Pudimott, at least, fired when he was already standing clear of

the car: "[I]t's my belief, both from the video and from the testimony, that it wasn't until the

officer was in that position [leaning on the car's hood] and the car is going forward at him that he

got off the car, hit the side-view mirror, *and then fired*."  Defs.' Sealed Ex. 2 at 6 (emphasis

added).  And it was undisputed in the Superior Court that several bullets entered the car through

the driver's side window and the passenger side window, not through the front windshield.  <u>See</u>

Defs.' Supp. Br. at 5-6.

      As explained later in this Opinion, this unresolved factual question bears on the

reasonableness of the force used by the deputies; but answering the question was not a necessary

part of Mr. Fenwick's juvenile delinquency adjudication.  The only factual matter regarding the

shooting that the Superior Court judge needed to determine for purposes of the assault charge

was whether the deputies began firing before or after Mr. Fenwick accelerated forward in the car.

This determination was necessary to her ruling, because if the officers began firing while the car

was still at rest (as Mr. Fenwick claimed), then driving forward and endangering Deputy

Pudimott in the process could not be regarded as lacking "justifiable and excusable cause."  D.C.

Code § 22-405(b).  Further precision about exactly when each deputy fired his weapon, or where

Deputy Pudimott stood in relation to the moving vehicle at the time, was unnecessary.

      For the same reasons, Judge Broderick also rendered no opinion on the legal

question of whether shooting Mr. Fenwick in response to the danger posed to Deputy Pudimott

— as opposed to taking a less extreme course of action — constituted an excessive use of force under the Fourth Amendment.  That legal conclusion, like the antecedent factual findings it would have necessitated, was irrelevant to the court's task.  Thus, even if Judge Broderick had expressed a view about these matters, any such determination would have been "merely dictum" and not "essential to the judgment."  Modiri v. 1342 Rest. Group, Inc., 904 A.2d at 394.

The District of Columbia Court of Appeals has found collateral estoppel inapplicable in a case involving similar circumstances.  In Lassiter, a police officer was sued for assault by a plaintiff who had been convicted in juvenile proceedings of assaulting the officer during the same incident.  The court held that because the issues in the two proceedings were different, collateral estoppel presented no bar to the plaintiff's claim:

> [A]lthough the juvenile court found that appellant assaulted the police officer — a finding that indicates the reasonableness of some force by the police to accomplish custody — it is true nonetheless that the issue of *excessive* force by the police under the circumstances was not "actually recognized by the parties as important and by the trier as necessary to the first judgment[.]"  An evaluation of the severity of the police response to appellant's attack was not at issue, and thus was not adjudicated, in the juvenile proceeding. It follows that collateral estoppel does not necessarily bar appellant's assault claim.

Lassiter v. Dist. of Columbia, 447 A.2d at 460 (citations omitted).  Similarly, in District of Columbia v. Peters, 527 A.2d 1269, 1271 (D.C. 1987), police officers shot a plaintiff while trying to arrest him, and he later sued on a claim of excessive force, prevailing before a jury.  Upholding the verdict, the court of appeals held that the plaintiff's conviction for APO arising from the same incident did not preclude his claim, because "[t]he question whether [the officer] used excessive force in apprehending [the plaintiff] was not necessarily litigated in the criminal action."  Id. at 1275 (citing Lassiter v. Dist. of Columbia, 447 A.2d at 460).

The same holds true here.  Neither the precise facts surrounding the deputies' shooting of Mr. Fenwick as (or after) he assaulted Deputy Pudimott, nor the legal determination of whether their use of force was excessive, were decided in his juvenile delinquency proceeding.  Under the standards governing collateral estoppel in the District of Columbia, therefore, the juvenile adjudication does not bar Mr. Fenwick's <u>Bivens</u> claims for excessive force.

That conclusion, however, does not end the matter.  Although Mr. Fenwick's claims are not entirely foreclosed, the juvenile delinquency proceeding necessarily established certain facts and conclusions of law that significantly limit the scope of the issues he may contest here.  <u>See</u> <u>Modiri v. 1342 Rest. Group, Inc.</u>, 904 A.2d at 394; <u>Patton v. Klein</u>, 746 A.2d at 871 (stating that collateral estoppel may be used "to prevent a plaintiff from relitigating issues which the plaintiff lost previously" in an earlier proceeding); <u>cf.</u> <u>M.D. ex rel. Daniels v. Smith</u>, 504 F. Supp. 2d 1238, 1252 (M.D. Ala. 2007) ("[E]ven if collateral estoppel does not bar a § 1983 suit, it may limit what facts a § 1983 plaintiff can dispute on defendant's motion for summary judgment[.]").  Although the constitutionality of the force used by the officers against Mr. Fenwick was not at issue in the earlier proceeding, "the court obviously had to make at least some findings about [the officers'] own conduct to determine whether [Mr. Fenwick] committed criminal assault; *i.e.*, the court had to develop a coherent view of how [the officers and Mr. Fenwick] dealt with each other" during the incident.  <u>Lassiter v. Dist. of Columbia</u>, 447 A.2d at 460.

This Court concludes that as a result of the factual and legal issues necessarily resolved by Judge Broderick in the Superior Court, Mr. Fenwick is precluded from advancing here the following assertions that he tenders in his complaint:

- "At all times material hereto, Defendant Officers had no information from . . . any . . . source suggesting that M.F. was a felon or, in any way, a danger to officers or the public at large."  Complaint ¶ 16.  To the contrary, the deputies' personal observations gave them reasonable suspicion that Mr. Fenwick may have been driving a stolen car.  Moreover, at the moment he accelerated forward in the car, the deputies reasonably could have believed that he was a danger to Deputy Pudimott.

- "M.F. engaged in no conduct which would raise suspicion that he was about to use any weapon that would create in the mind of a reasonable officer that the fear of bodily harm was imminent."  Id. ¶ 18.  Mr. Fenwick's acceleration forward in the vehicle reasonably could have caused the deputies to fear that Deputy Pudimott was in imminent danger of being hit by the vehicle.

- "Defendant officers were not in any reasonable fear or apprehension of bodily harm nor were they in fear of any imminent danger." Id. ¶ 19.  See above.

- "There was no indication that M.F. was stealing a car[.]"  Id.  ¶ 23.  See above.

- "M.F. . . . had a right to leave the residential complex unassailed at the time of the shooting.  He did not . . . have any reason to believe he was under arrest."  Id. ¶ 25.  While he may not have had reason to believe he was technically under arrest, at the time Mr. Fenwick accelerated toward the exit to the parking lot, the deputies were surrounding the car ordering him to stop and exit the vehicle, and Deputy Pudimott was leaning on the front hood with his gun drawn.

- "Defendants Fischer and Pudimott condoned, covered up and engaged in a conspiracy to hide the misdeeds of themselves and their fellow officers." Id. ¶ 29.  To the extent that Mr. Fenwick may seek to prove in this action, as he initially alleged in the juvenile proceeding, that the deputies made up their story about suspecting him of theft and the danger posed to Deputy Pudimott, such an attempt is precluded.

- "Defendant Officer Mickle did not fire his service weapon but encouraged, condoned, covered up and engaged in a conspiracy to hide the misdeeds of his fellow officers." Id. ¶ 31.  See above.

- "[T]he Defendant officers had neither probable cause nor reasonable suspicion that M.F. had committed any crime; or that he presented a threat of serious bodily harm or death to Defendant Officers."  Id. ¶ 40(B).  The deputies had reasonable suspicion to believe that Mr. Fenwick was driving a stolen vehicle.  Moreover, at the moment he accelerated forward in the car, the deputies had reason to believe that he presented a threat of serious bodily harm to Deputy Pudimott.

Each of these allegations is precluded because it is inconsistent with factual or legal determinations that were necessary to the adjudication of Mr. Fenwick's assault charge.  <u>See</u> Defs.' Sealed Ex. 2 at 4-6.

Likewise, Mr. Fenwick may not attempt to prove the following allegations that he sets forth in his declaration:

- that he was shot while the car was stopped, before it started moving forward;

- that "the only reason [he] started driving was to get away from the shooting"; and

- that he was not aware that any deputies were near the car until he was shot.

<u>See</u> Fenwick Decl. at 3-4.  Contrary to these allegations, Judge Broderick found that before any shots were fired, Mr. Fenwick drove forward with Deputy Pudimott "clearly visible" leaning over the hood of the vehicle.  Defs.' Sealed Ex. 2 at 4-6.  Mr. Fenwick had a full and fair opportunity to contest these issues in the Superior Court: the judge and the parties recognized them as essential to resolution of the assault charge, and Mr. Fenwick relied on video footage, ballistics evidence, and eyewitness testimony in support of his contentions.  <u>See</u> Defs.' Sealed Ex. 14 at 20-25; <u>see also</u> Defs.' Sealed Ex. 12 at 34, 46, 49, 50, 52.  The requirements for collateral estoppel thus satisfied, Mr. Fenwick is precluded from relying on these allegations.

As explained elsewhere in this Opinion, however, Mr. Fenwick has a colorable claim for excessive force even without any of these allegations, and collateral estoppel therefore does not demand dismissal of his claims.

### 2.  FTCA Claims for Assault and Battery

Similar reasoning compels the conclusion that Mr. Fenwick's claims against the United States under the FTCA for common law assault and battery are not precluded by the results of his juvenile delinquency adjudication.

An assault is defined in the District of Columbia as "an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim." Etheredge v. Dist. of Columbia, 635 A.2d 908, 916 (D.C. 1993) (citing Jackson v. District of Columbia, 412 A.2d 948, 955 & n.15 (D.C. 1979)).  "A battery is an intentional act that causes a harmful or offensive bodily contact." Id. (quoting Jackson v. District of Columbia, 412 A.2d at 955). Shooting a victim constitutes both assault and battery, Etheredge v. District of Columbia, 635 A.2d at 916, and the question in such cases often becomes "whether, under the circumstances, [the defendant] had the legal right to do so." Id.; see District of Columbia v. Chinn, 839 A.2d 701, 705-706 (D.C. 2003) (noting that in cases alleging police officer abuse, "[u]sually [the] technical requirements of assault and battery are satisfied . . . and the outcome of the case turns on the defense of privilege").  "It is well established that a police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not 'in excess of those which the actor reasonably believes to be necessary." Kotsch v. District of Columbia, 924 A.2d 1040, 1047 (D.C. 2007) (quoting Etheredge v. District of Columbia, 635 A.2d at 916).  "Moreover, any person, including an officer, is justified in using reasonable force to repel an actual assault, or if he reasonably believes he is in danger of bodily harm." Id.  "For assault and battery the inquiry is whether the officer's conduct was reasonably necessary and thereby privileged[.]" District of Columbia v. Chinn, 839 A.2d at 707 (quoting Holder v. District of Columbia, 700 A.2d 738, 742 (D.C. 1997)).

Just as the judge in Mr. Fenwick's delinquency proceeding had no need to determine whether the deputies' actions constituted excessive force under the Fourth Amendment, or to make the factual findings necessary for such a determination, she also did not need to decide whether, at the moment they fired their weapons, the deputies "reasonably

believe[d] [they were] in danger of bodily harm," or whether the means they employed to stop

Mr. Fenwick were "in excess of those which [they] reasonably believe[d] to be necessary."

Kotsch v. District of Columbia, 924 A.2d at 1047; see id. at 1050 ("[A]lthough the officers had

probable cause to arrest appellant . . . the jury could consider that the offense he allegedly

committed . . . did not warrant the use of such force as would cause the injuries appellant

suffered."). Such questions were immaterial to the adjudication of the assault charge against Mr.

Fenwick, the sole exception being the question of whether the deputies shot Mr. Fenwick without

any provocation at all, as he claimed. The judge made no factual findings and reached no legal

conclusion about whether the deputies still reasonably believed Deputy Pudimott to be in danger

when they fired on Mr. Fenwick, or whether their use of deadly force went beyond what they

reasonably could believe to be necessary under the circumstances.

Thus, Mr. Fenwick's assault and battery claims against the United States under

the FTCA are not precluded. The scope of the issues that Mr. Fenwick may contest with respect

to those claims, however, is limited by the Superior Court's resolution the factual and legal

matters set forth above with respect to his Fourth Amendment claim.

### B.  Heck v. Humphrey

"Under Heck v. Humphrey, a section 1983 damages claim that is based on

conduct whose unlawfulness would demonstrate the invalidity of a conviction or sentence is not

cognizable unless the conviction or sentence has been invalidated or called into question by

issuance of a writ of habeas corpus."  In re Jones, 652 F.3d 36, 37-38 (D.C. Cir. 2011) (citing

Heck v. Humphrey, 512 U.S. 477, 486-87 (1994)). The Heck doctrine applies to Bivens actions

as well as to Section 1983 actions. Williams v. Hill, 74 F.3d 1339, 1341 (D.C. Cir. 1996). But

"Heck's application is limited to suits that, if successful, would *necessarily* imply the invalidity

of the plaintiff's conviction or sentence, *i.e.*, suits challenging the fact or duration of

confinement." Taylor v. U.S. Prob. Office, 409 F.3d 426, 427 (D.C. Cir. 2005) (emphasis aded).

The Supreme Court was "careful . . . to stress the importance of the term 'necessarily'" in

concluding that damages actions are barred if their success would "necessarily imply" the

invalidity of a conviction or sentence. Nelson v. Campbell, 541 U.S. 637, 647 (2004).

Underlying the Heck doctrine is the principle is that "civil tort actions are not appropriate

vehicles for challenging the validity of outstanding criminal judgments[.]" Taylor v. U.S. Prob.

Office, 409 F.3d at 429 (quoting Heck v. Humphrey, 512 U.S. at 486). The doctrine "is not . . .

implicated by a prisoner's challenge that threatens no consequence for his conviction or the

duration of his sentence." Id. at 427 (quoting Muhammad v. Close, 540 U.S. 749, 751 (2004)).

When "the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any

outstanding criminal judgment against the plaintiff, the action should be allowed to proceed." Id.

(quoting Heck v. Humphrey, 512 U.S. at 487).

"A § 1983 excessive force claim brought against a police officer that arises out of

the officer's use of force during an arrest does not necessarily call into question the validity of an

underlying state conviction and so is not barred by Heck." Thore v. Howe, 466 F.3d 173, 180

(1st Cir. 2006) (citing VanGilder v. Baker, 435 F.3d 689, 692 (7th Cir. 2006)). "Even the fact

that [a] defendant was convicted of *assault* on a police officer does not, under Heck, as a matter

of law *necessarily* bar a § 1983 claim of excessive force." Id. (citing Smithart v. Towery, 79

F.3d 951, 952-53 (9th Cir. 1996), and Ballard v. Burton, 444 F.3d 391, 399-400 (5th Cir. 2006)).

Instead, "courts will allow § 1983 suits to proceed when it is possible that the facts could allow a

successful § 1983 suit and the underlying conviction both to stand without contradicting each

other." Dyer v. Lee, 488 F.3d 876, 881 (11th Cir. 2007). See, e.g., Ballard v. Burton, 444 F.3d

at 398 ("If it is possible for Ballard to have assaulted Boling *and* for Burton's shooting of Ballard to have been objectively unreasonable, then <u>Heck</u> does not bar Ballard's claim."). "To properly apply <u>Heck</u>'s bar against certain damage actions, a district court must analyze the relationship between the plaintiff's [ ] claim and the charge on which he was convicted." <u>Hardrick v. City of Bolingbrook</u>, 522 F.3d 758, 762 (7th Cir. 2008).

Under the assault on a police officer statute, D.C. Code § 22-405(b), "[w]hoever without justifiable and excusable cause, assaults, resists, opposes, impedes, intimidates, or interferes with a law enforcement officer on account of, or while that law enforcement officer is engaged in the performance of his or her official duties," is liable for misdemeanor assault on a police officer. "A person who violates subsection (b) [and] commits a violent act that creates a grave risk of causing significant bodily injury to the officer, shall be guilty of a felony." D.C. Code § 22-405(c). Mr. Fenwick was found to have committed felony assault on an officer for driving forward in a vehicle with Deputy Pudimott in view and in danger of being hit, and the Superior Court held that this was an "assaultive," "resisting," "opposing," and "interfering" violation of the statute. Defs.' Sealed Ex. 2 at 4-6.

There are at least three discernible theories under which Mr. Fenwick could prevail in this Court on his claims of excessive force arising from his encounter with the deputies. Success on the first theory would imply that the outcome of his juvenile adjudication for assault on a police officer was invalid. It therefore is barred under <u>Heck</u>, and Mr. Fenwick may not pursue it. But because the other two theories would not in any way undermine the legitimacy of his assault adjudication, <u>Heck</u> does not present a complete bar to his excessive force claims.

First, Mr. Fenwick could prevail by demonstrating (as alleged in his complaint) that the deputies fired on him while the car he was driving was at rest — conduct that under the circumstances likely would constitute excessive force.  If he prevails on this basis, however, it would imply that the result of his assault adjudication was invalid, because if Mr. Fenwick drove the car forward (endangering Deputy Pudimott) to escape from unprovoked gunfire, then he could not legitimately have been found in violation of D.C. Code § 22-405(b), which exempts actions having "justifiable and excusable cause."  This is especially true here because Judge Broderick specifically found that Mr. Fenwick committed an "assaultive" violation of the statute, and not merely a "resisting," "opposing," and "interfering" violation.  Defs.' Sealed Ex. 2 at 6. If Mr. Fenwick's allegations were accepted in this Court, the Superior Court's judgment on the assault charge would have to be regarded as invalid — a consideration that is fatal to those allegations under Heck.  See Thore v. Howe, 466 F.3d at 180 ("In this case Thore asserts two theories.  The first is that he was not guilty of assault at all, and so Officer Howe's use of force was excessive.  That theory is plainly barred by Heck.").  Moreover, as explained above, Mr. Fenwick independently is collaterally estopped from advancing in this Court the allegation that he was fired upon while the vehicle was at rest.

Accepting, as this Court must, that the deputies fired on Mr. Fenwick only after he began driving forward and placed Deputy Pudimott in danger, Mr. Fenwick still might be able to prevail on an excessive force claim by demonstrating that some or all of the shots that hit him were fired by the deputies after it was clear that the danger to Deputy Pudimott already had passed.  See Complaint ¶ 38; Fenwick Decl. at 3-4; Opp. at 21-22 (arguing that "the shooting came after the threat ended" when Deputy Pudimott "was clear of the car and in no danger," and that "the video tape clearly shows the car driving away while the officer fires at it").  Whether or

not the evidence and the law will support this theory — something discussed below in regard to

qualified immunity — Mr. Fenwick's success would have no bearing on the validity of his

adjudication, which required only a determination that Mr. Fenwick first assaulted Deputy

Pudimott.  A verdict that the deputies' response to that assault was excessive would not call the

adjudication into doubt.  See Dyer v. Lee, 488 F.3d at 882-83 ("[S]o long as the last act in the

altercation was one of excessive force by the police, a § 1983 suit on that basis would not negate

the underlying conviction."); Sanford v. Motts, 258 F.3d 1117, 1120 (9th Cir. 2001) ("[I]f Motts

used excessive force subsequent to the time Sanford interfered with his duty, success in her

section 1983 claim will not invalidate her conviction.").

Mr. Fenwick theoretically also could prevail on his excessive force claims by

demonstrating that under the circumstances the deputies' use of *deadly* force was an objectively

unreasonable response to the danger he posed to Deputy Pudimott, regardless of when the shots

were fired.  See Complaint ¶ 40(A) ("At the time of the shooting, Defendant Officers acted in the

absence of any reasonable, individualized suspicion that [Mr. Fenwick] was guilty of any crime

justifying the use of a firearm."); Opp. at 35-36 ("[The defendants] do not claim that they needed

to kill Plaintiff in order to protect their lives. . . . They protected themselves, to the extent they

[were] in danger, simply by taking a step back from the car.").  Whatever the merit of this theory,

its success would in no way imply the invalidity of Mr. Fenwick's adjudication, as it would not

negate any element of the assault statute that he was found to have violated.  His contentions

therefore "do not present a collateral attack to [his] conviction, but rather assert an argument that

[he] suffered unnecessary injuries because [the deputy's] response to his resistance . . . was not,

under the law governing excessive use of force, objectively reasonable."  Hardrick v. City of

Bolingbrook, 522 F.3d at 764 (internal quotation marks omitted).  Indeed, to hold Mr. Fenwick's

claims entirely barred merely because of his assault adjudication "would imply that once a

person resists law enforcement, he has invited the police to inflict any reaction or retribution they

choose, while forfeiting the right to sue for damages." VanGilder v. Baker, 435 F.3d at 692.

"Public officials who use force reasonably necessary to subdue an aggressor are not liable on the

merits; but *whether* the force was reasonable is a question that may be litigated without

transgressing Heck[.]" Gilbert v. Cook, 512 F.3d 899, 901 (7th Cir. 2008).

      In short, a jury could accept that Mr. Fenwick assaulted Deputy Pudimott as

described in the Superior Court's findings *and* that the deputies responded to this assault with

constitutionally excessive force — because less extreme measures should have been taken, or

because some of the deadly force was directed at Mr. Fenwick after he no longer posed a threat,

or both. "Because a successful . . . action for excessive force would not necessarily imply the

invalidity of [Mr. Fenwick]'s arrest or conviction, Heck does not preclude [his] excessive force

claim" in its entirety. Smithart v. Towery, 79 F.3d at 952.

      When a plaintiff's complaint advances factual and legal assertions that are barred

by Heck, but where the complaint also supports other viable theories of relief that do not depend

on those assertions, a court may disregard, "as mere surplusage," the portions of the complaint

that set forth allegations precluded by Heck. Moore v. Mahone, 652 F.3d 722, 725 (7th Cir.

2011); see id. (finding dismissal warranted because without the Heck-barred allegations the

plaintiff stated no plausible claim for relief); Evans v. Poskon, 603 F.3d at 364 ("Heck prevents

[a] person from prevailing . . . on a position incompatible with the conviction, but the plaintiff

need not adopt the defendants' view of what occurred in order to contest the degree of force

used."). For the purposes of summary judgment, this Court will consider only those arguments

and assertions made by Mr. Fenwick that are not barred by his previous adjudication. Should the

case proceed to trial, the Court can implement <u>Heck</u> by precluding certain evidence and "through instructions to the jury at the start of trial, as necessary during the evidence, and at the close of the evidence."  <u>Gilbert v. Cook</u>, 512 F.3d at 902.[5]

In this case, the outcome demanded by <u>Heck v. Humphrey</u> dovetails with the requirements of collateral estoppel, because the factual and legal conclusions that Mr. Fenwick may not relitigate here as a result of collateral estoppel are the same ones that — if decided in his favor — would imply the invalidity of his juvenile delinquency adjudication.  While neither doctrine bars his claims, both identically restrict the scope of the issues he may litigate in this Court.[6]

### C.  FTCA Claim for False Imprisonment

Although Mr. Fenwick's complaint lists false imprisonment under the FTCA as one of its claims, he does not allege that he was detained at the scene of his encounter with the deputies.  The only allegation in the complaint that relates in any way to false imprisonment is Mr. Fenwick's assertion that he "continued to suffer at the hands of the conspirators as [he] was restrained to a hospital bed in a very painful position, was denied access to his mother, and denied access to his attorney while in the hospital beyond any reasonable period of detention as set forth under D.C. law."  Complaint ¶ 40(E).  These allegations have not been developed

---

[5]     <u>See</u>, <u>e.g.</u>, <u>Gilbert v. Cook</u>, 512 F.3d at 902 ("It would have sufficed to tell the jurors that Gilbert struck the first blow during the fracas[,] that any statements to the contrary by Gilbert [or] a witness must be ignored, and that what the jurors needed to determine was whether the guards used more force than was reasonably necessary to protect themselves from an unruly prisoner.").

[6]     Although the parties have only fleetingly addressed the issue, <u>see</u> Mem. at 39; Opp. at 46, courts have held that <u>Heck v. Humphrey</u> can bar FTCA claims against the United States.  <u>See</u> <u>Hall v. Admin. Office of U.S. Courts</u>, 496 F. Supp. 2d 203, 208 (D.D.C. 2007).  It appears to the Court that any limitations imposed by <u>Heck</u> on Mr. Fenwick's assault and battery claims would be the same as the restrictions imposed on his <u>Bivens</u> claim for excessive force.

further in Mr. Fenwick's briefing.  See Opp.; Pl.'s Supp. Mem.  Moreover, Mr. Fenwick has

furnished no evidence of how the purportedly objectionable circumstances of his hospital stay

have any connection to the deputies (who were not the ones to arrest him), nor has he made any

more specific allegations fleshing out this accusation.  In fact, he does not address the false

imprisonment claim at all in his opposition to the defendants' motion to dismiss.  Given these

deficiencies and the apparent lack of substance to the claim, the Court will grant judgment to the

United States on Mr. Fenwick's FTCA claim for false imprisonment.  See Laningham v. United

States Navy, 813 F.2d at 1242 (summary judgment may be granted if non-moving party fails to

provide evidence that would permit a reasonable jury to find in his favor).

### D.  Claims Against Deputy Mickle

It is undisputed that Deputy U.S. Marshal John Mickle never fired his weapon

during the incident.  See Complaint ¶ 31.  The complaint alleges only that he "encouraged,

condoned, covered up and entered into a conspiracy to hide the misdeeds of his fellow officers."

Id.  To the extent that Mr. Fenwick may be arguing that Deputy Mickle "encouraged" the

shooting, he has offered no evidence to support that allegation.  Nor has he provided any

evidence that Deputy Mickle "condoned, covered up and entered into a conspiracy to hide the

misdeeds of his fellow officers," assuming that such conduct could lead to liability for assault,

battery, or excessive force.  For these reasons, the Court will grant the defendants' motion for

summary judgment with respect to the Bivens claim against Deputy Mickle and any FTCA

claims against the United States that are premised on the actions of Deputy Mickle.

*E.   Qualified Immunity*

The defendants maintain that they are entitled to judgment on Mr. Fenwick's

Bivens and FTCA claims because the deputies' conduct is, at minimum, protected by qualified

immunity.  Key facts are in dispute, however, that if resolved in the plaintiff's favor could result

in a finding that the deputies violated Mr. Fenwick's clearly established rights.  The Court

therefore does not find the defendants entitled to qualified immunity at this juncture.

1.  Standards Governing Qualified Immunity

"The Supreme Court has held that 'government officials performing discretionary

functions generally are shielded from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would

have known.'"  Pitt v. District of Columbia, 491 F.3d 494, 509 (D.C. Cir. 2007) (quoting Harlow

v. Fitzgerald, 457 U.S. 800, 818 (1982)).  "Whether an official protected by qualified immunity

may be held personally liable . . . generally turns on the objective legal reasonableness of the

action."  Muhammad v. Dist. of Columbia, 881 F. Supp. 2d 115, 121 (D.D.C. 2012) (quoting

Wilson v. Layne, 526 U.S. 603, 614 (1999)).  A defendant's entitlement to qualified immunity

thus is a question of law to be decided by the Court.  Pitt v. District of Columbia, 491 F.3d at

509.

In determining whether an official has qualified immunity, the Court engages in a

two-step analysis, and the Court has "discretion to decide which of the two prongs of [the]

qualified-immunity analysis to tackle first."  Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)

(citing Pearson v. Callahan, 555 U.S. 223, 236 (2009)); accord Taylor v. Reilly, 685 F.3d 1110,

1112-13 (D.C. Cir. 2012).  The Court may begin by asking whether, "[t]aken in the light most

favorable to the party asserting the injury . . . the facts alleged show the officer's conduct

violated a constitutional right[.]"  Saucier v. Katz, 533 U.S. 194, 201 (2001); see id. ("If no

constitutional right would have been violated were the allegations established, there is no

necessity for further inquiries concerning qualified immunity.").  If a constitutional right of the

plaintiff has been violated, the court must then assess whether, "in light of the specific context of

the case," the right in question was "clearly established."  Id.  As the Supreme Court observed in

Pearson, however, "[t]here are cases in which it is plain that a constitutional right is not clearly

established but far from obvious whether in fact there is such a right."  Pearson v. Callahan, 555

U.S. at 237.  In such cases the court may end the inquiry without deciding whether the plaintiffs'

rights were violated.  Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012) (citing Pearson v.

Callahan, 555 U.S. at 227, 236).

   "[T]he protection of qualified immunity is available if 'a reasonable officer could

have believed that [his or her actions were] lawful, in light of clearly established law and the

information the officers possessed.'"  Youngbey v. March, 676 F.3d 1114, 1117 (D.C. Cir. 2012)

(quoting Wilson v. Layne, 526 U.S. at 615) (second brackets in original).  Showing that the

defendant's actions violated clearly established law "do[es] not require a case directly on point,

but existing precedent must have placed the statutory or constitutional question beyond debate."

Ashcroft v. al-Kidd, 131 S. Ct. at 2083; see also Taylor v. Reilly, 685 F.3d at 1113-14.  A clearly

established right is derived from an examination of Supreme Court rulings and controlling

authority in a court's respective jurisdiction; if neither of those sources provides controlling

authority the Court "must [then] determine whether there is 'a consensus of cases of persuasive

authority.'"  Youngbey v. March, 676 F.3d at 1117 (quoting Wilson v. Layne, 526 U.S. at 615).

"The contours of the right must be sufficiently clear that a reasonable official would understand

that what he is doing violates that right."  Ashcroft v. al-Kidd, 131 S. Ct. at 2083 (quoting

Anderson v. Creighton, 483 U.S. 635, 640 (1987)) (alterations omitted); accord Butera v. District of Columbia, 235 F.3d 637, 646 (D.C. Cir. 2001).

While trial courts should resolve immunity questions "at the earliest possible stage in litigation," Hunter v. Bryant, 502 U.S. 224, 226 (1991), "[p]re-trial resolution of the [qualified immunity] defense . . . may be thwarted by a factual dispute." Halcomb v. Washington Metro. Area Transit Auth., 526 F. Supp. 2d 20, 22 (D.D.C. 2007) (quoting Warren v. Dwyer, 906 F.2d 70, 74 (2d Cir. 1990)); see Johnson v. District of Columbia, 528 F.3d 969, 977-78 (D.C. Cir. 2008) (summary judgment on qualified immunity was "premature" where testimony of plaintiff and police officers conflicted, creating genuine issue of material fact as to whether police acted reasonably); Arrington v. United States, 473 F.3d 329, 338-39 (D.C. Cir. 2006) (same).[7]

2.  Genuine Issues of Material Fact Regarding Excessive Force

In this case, genuine issues of material fact prevent the Court from granting summary judgment to the defendants.  Based on the evidence before the Court, taken in the light most favorable to Mr. Fenwick, a reasonable jury could conclude that Deputies Fischer and Pudimott fired some or all of the shots that injured Mr. Fenwick at a point when it should have

---

[7]      That is why in some cases "[c]ourts . . . have permitted the defense [of qualified immunity] to be raised at the close of plaintiff's evidence on a motion for a directed verdict, and even on a subsequent motion for judgment notwithstanding the verdict." Warren v. Dwyer, 906 F.2d at 74.  A trial court may also require the jury to answer special interrogatories in order to decide which version of the facts should be relied upon by the court in reaching its legal conclusion with respect to qualified immunity.  See 2 SHELDON H. NAHMOD, CIVIL RIGHTS AND CIVIL LIBERTIES LITIGATION § 8:22 at 8-88 to 8-90 (4th ed. 2003); see also Cowan ex rel. Estate of Cooper v. Breen, 352 F.3d 756, 764 (2d Cir. 2003) (recommending use of "interrogatories on the key factual disputes"); Johnson v. Breeden, 280 F.3d 1308, 1318 (11th Cir. 2002) ("When the case goes to trial, the jury itself decides the issues of historical fact that are determinative of the qualified immunity defense, but the jury does not apply the law relating to qualified immunity to those historical facts it finds; that is the court's duty. . . . A tool used to apportion the jury and court functions relating to qualified immunity issues in cases that go to trial is special interrogatories to the jury.").

been apparent to them that neither Deputy Pudimott nor anyone else was in any danger.  If so, then under the circumstances of this case the deputies violated Mr. Fenwick's clearly established constitutional rights.  Because the Court cannot make its qualified immunity determination without resolving this factual dispute, the Court must deny the defendants' request for summary judgment.  See Johnson v. District of Columbia, 528 F.3d at 977; Halcomb v. Washington Metro. Area Transit Auth., 526 F. Supp. 2d at 23 ("Because there appear to be legitimate and material factual disputes about what Officer Woods and Ms. Halcomb actually did, this Court is not yet in a position to decide, as a matter of law, whether Officer Woods is entitled to qualified immunity.").

In a case involving the use of deadly force against a suspect who is attempting to flee, "the constitutional question . . . is governed by the principles enunciated in Tennessee v. Garner, 471 U.S. 1 (1985), and Graham v. Connor, 490 U.S. 386 (1989)."  Brosseau v. Haugen, 543 U.S. 194, 197 (2004).  "These cases establish that claims of excessive force are to be judged under the Fourth Amendment's 'objective reasonableness' standard."  Id. (quoting Graham v. Connor, 490 U.S. at 388).  "Specifically with regard to deadly force, [the Supreme Court] explained in Garner that it is unreasonable for an officer to 'seize an unarmed, nondangerous suspect by shooting him dead.'  But '[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.'"  Id. (quoting Tennessee v. Garner, 471 U.S.at 11).  The "reasonableness" of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight."  White v. United States, 863 F. Supp. 2d 41, 48 (D.D.C. 2012) (quoting Graham v. Connor, 490 U.S. at 396).  Only the objective reasonableness of the force may be considered; the

subjective intent of the officers is irrelevant.  Wasserman v. Rodacker, 557 F.3d 635, 641 (D.C. Cir. 2009).  While courts evaluate the objective reasonableness of officers' actions by viewing the events from their perspective, the facts in the record and all reasonable inferences derived therefrom must be viewed in the light most favorable to the plaintiff.  Scott v. District of Columbia, 101 F.3d 748, 759 (D.C. Cir. 1996) (citing Wardlaw v. Pickett, 1 F.3d 1297, 1303 (D.C. Cir. 1993)).

Here, the defendants contend that a reasonable officer could have believed it necessary to fire on Mr. Fenwick to stop "his dangerous and potentially life threatening driving of the vehicle directed toward one or more deputies."  Mem. at 25.  As an initial matter, the defendants offer no evidence that Mr. Fenwick ever posed a threat to Deputy Fischer or Deputy Mickle or that the deputies reasonably could have thought so.[8]  Nor have they offered evidence that Mr. Fenwick's conduct may have endangered any bystanders at the scene.  The defendants' actions, therefore, can be justified only as a response to the threat Mr. Fenwick posed to Deputy Pudimott.

In support of their version of events — in which deadly force was reasonably deemed necessary by the deputies to mitigate the threat to Deputy Pudimott — the defendants rely exclusively on video footage of the incident and on the findings made by the Superior Court in Mr. Fenwick's juvenile delinquency proceedings.  See Mem. at 30.  With respect to the latter, Mr. Fenwick's juvenile adjudication for felony assault on an officer does establish, as a matter of collateral estoppel, that during the encounter Mr. Fenwick created a "grave risk of causing significant bodily injury" to Deputy Pudimott by driving the vehicle forward in a way that could

---

[8]         Indeed, the Superior Court judge concluded to the contrary: "As he drove off, I don't see that he in any way aimed towards or resisted *or did anything towards Officer Fischer*. So I only find one count of assault with a police officer in that regard."  Defs.' Sealed Ex. 2 at 6 (emphasis added).

have harmed the deputy.  See D.C. Code § 22-405(c); Defs.' Sealed Ex. 2 at 4-6.  But as explained earlier, that adjudication did not establish whether the deputies reasonably could have believed that Mr. Fenwick still posed a danger to Deputy Pudimott by the time they shot him. These questions were irrelevant to the assault charge under consideration.

The video evidence consists of surveillance footage of the area in which the incident occurred, taken from several cameras positioned in different locations.  One video in particular captures most of the incident.  As the Superior Court judge observed, however, "the quality of the video is somewhat grainy" and "a lot of what happens [occurs] in the darker portion of the video," so the video is "helpful for broad strokes" but is "not particularly helpful for finer movements and finer points."  Defs.' Sealed Ex. 2 at 3-4.  Perhaps as a result, the defendants and the plaintiff both see the video as vindicating their own accounts of what took place.

Having examined the video footage carefully, the Court is not persuaded that it provides ready answers to the factual dispute between the parties about when Mr. Fenwick was shot — particularly since all reasonable inferences must be drawn in Mr. Fenwick's favor at the summary judgment stage.  That is, the Court believes that a reasonable jury could conclude based on the video footage that Deputy Fischer, Deputy Pudimott, or both fired on Mr. Fenwick at a point when it was clear to any reasonable officer that Deputy Pudimott already was safe from any danger posed by Mr. Fenwick's driving.

Most of the encounter was captured by a camera positioned across the street from the parking space in which Mr. Fenwick had parked the car; the camera footage faces the back of the parked vehicle from an elevated vantage point.  The video shows Mr. Fenwick walk back to the car from the residence he had visited, open the door, pause momentarily while looking across

the street and pointing to his chest in the "Who, me?" manner described earlier, get into the car, and close the door.  The car's brake lights promptly come on, and the car begins pulling backward out of the spot.  As it does so, Deputy Pudimott enters the video frame from the left and rushes toward the driver's side door, seemingly running into the door and pushing off from it with his hands.  The car continues to reverse out of the parking space backward and to the left in a curved "J" shape, coming to rest momentarily when it is almost perpendicular to the parking space it just vacated (and thus almost parallel to the street) but still slanting slightly toward the parking spaces on its left.  At this point, Deputy Pudimott can be seen near the driver's side rearview mirror, and Deputy Mickle becomes visible near the driver's side back door.

By the time the car has backed out of the parking space, it and the deputies are covered by the shadow cast by a nearby building and are positioned in the bottom-left corner of the video frame, so that the car is only partially visible.  This, along with the blurry quality of the video, makes it difficult to discern exactly what is happening and where the deputies are positioned.  Contributing to the difficulty is the fact that Deputies Pudimott and Mickle can be seen only on the other side of the vehicle, which obscures the bottom halves of their bodies.  It is clear, however, that in the next moments as the car begins to move forward, Deputy Pudimott can be seen moving along with it, leaning over the hood on the left side of the car.  The deputy's left hand is visible resting on the hood while his right arm is extended toward the cab of the vehicle.  As the car continues to move forward and veers right to become fully parallel with the street, Deputy Pudimott keeps up with it for a few steps but quickly is left behind as the car continues onward and out of the picture on the right-hand side of the frame.

From the video, one cannot easily tell when Deputy Pudimott fires at Mr. Fenwick during this sequence or where he is positioned in relation to the car as he is shooting.

For that reason, one cannot discern whether he fired while still in danger of being hit by the car (or while he may reasonably have thought he was still in danger) or whether he fired after he was standing clear of the vehicle and it was continuing on its way.  Therefore the video alone, in the Court's view, does not conclusively resolve whether Mr. Fenwick could have been seen as "pos[ing] a threat of serious physical harm" to Deputy Pudimott when the officer shot him. Tennessee v. Garner, 471 U.S. at 11.

Deputy Fischer is partly visible in the same video.  As the car begins to pass Deputy Pudimott, the top half of Deputy Fischer's body comes into view at the bottom of the screen, both hands pointing his gun toward the car.  Deputy Fischer can be seen taking a step or two to keep pace with the vehicle, then stopping and pivoting, turning his body to keep his gun pointed at the car as it continues out of the screen.  Footage from a different camera, positioned across the street, shows Deputy Fischer moving briskly along the street with his gun pointed at something unseen below the bottom edge of the video frame.  A portion of the car then briefly comes into view in the lower left corner of the frame as it drives past Deputy Fischer out of view. Here too, Deputy Fischer can be seen stopping and pivoting as the car passes him, keeping his gun pointed at the car until it is well past him and out of the video frame.  It is not possible to say definitively from either video alone when Deputy Fischer fires his weapon — at least in the absence of supplementary evidence or assistance in interpreting the footage.  And because the other deputies are not visible at all in the second video, which catches only a partial glimpse of the car as it passes by, it is not apparent where Deputy Pudimott is located in relation to the car during any of Deputy Fischer's movements.

Presented with the video evidence alone, a jury reasonably might conclude that either or both of the deputies fired upon Mr. Fenwick when it was evident that Deputy Pudimott

was standing clear of the vehicle and was in no danger of being hit by the vehicle.  Cf. Scott v.

Harris, 550 U.S. 372, 378 (2007) ("The videotape quite clearly contradicts the version of the

story told by respondent and adopted by the Court of Appeals.").  In addition, Mr. Fenwick has

furnished other evidence supporting his version of events.  An FBI trajectory analysis reveals

that three bullets entered the vehicle's driver's side window, three more bullets entered the front

windshield on the passenger side, and a seventh bullet entered the passenger side window.  Opp.,

Ex. 1 at 3 (FBI Laboratory Firearms/Toolmarks Unit Report of Examination).  The preliminary

report of Mr. Fenwick's expert forensic scientist concludes, based on the positions of the bullet

holes, that "the responsible shots could not have been fired from a position or positions directly

in front of the vehicle or even in close proximity to the front of the vehicle."  Opp., Ex. 9 at 1

(Preliminary Report of Edward E. Hueske).

On the other hand, if the jury were to conclude, as it also reasonably could based

on the video evidence, that the deputies shot Mr. Fenwick only while it appeared to them that

Deputy Pudimott was still in danger, then their use of deadly force could be found objectively

reasonable under the Fourth Amendment.  See Hermiz v. City of Southfield, 484 F. App'x 13, 16

(6th Cir. 2012), cert. denied, 133 S. Ct. 650 (2012) ("Fourth Amendment law provides that an

officer may shoot at a driver that appears to pose an immediate threat to the officer's safety or

the safety of others — for example, a driver who objectively appears ready to drive into an

officer or bystander with his car.") (citing Brosseau v. Haugen, 543 U.S. at 197-200).

Where "the material facts underlying a defendant's claim of qualified immunity

are in dispute, 'it is impossible for the court to determine, as a matter of law, what predicate facts

exist to decide whether or not the officer's conduct clearly violated established law.'"  Estate of

Gaither v. Dist. of Columbia, 655 F. Supp. 2d 69, 98 (D.D.C. 2009) (quoting Halcomb v.

Washington Metro. Area Transit Auth., 526 F. Supp. 2d at 22).  "In other words, the Court

cannot determine at the summary judgment stage whether the challenged conduct would be

viewed as lawful by an objectively reasonable officer if the very facts establishing what that

conduct was are legitimately in dispute."  Id. (quotation omitted).  Those disputed facts "must

first be decided by the jury before the court answers the ultimate legal question whether a

defendant is entitled to qualified immunity."  Zhi Chen v. Dist. of Columbia, 808 F. Supp. 2d

252, 259 (D.D.C. 2011) (citing Zellner v. Summerlin, 494 F.3d 344, 367-68 (2d Cir. 2007)); see

Johnson v. District of Columbia, 528 F.3d at 977-78.  "If these facts are resolved in [the

deputies'] favor, then it seems likely that [they] would be entitled to qualified immunity.  But if

the jury resolves the facts in plaintiff['s] favor . . . then it seems equally likely that [the deputies]

would not be entitled to qualified immunity because it would have been clear to a reasonable

officer that his actions were unlawful under those circumstances."  Bolger v. Dist. of Columbia,

608 F. Supp. 2d 10, 22-23 (D.D.C. 2009).

       Assessing the reasonableness of a use of force requires giving "careful attention to

the facts and circumstances of [the] particular case, including the severity of the crime at issue,

whether the suspect poses an immediate threat to the safety of the officer or others, and whether

he is actively resisting arrest or attempting to evade arrest by flight."  Johnson v. District of

Columbia, 528 F.3d at 974 (quoting Graham v. Connor, 490 U.S. at 396); accord Oberwetter v.

Hilliard, 639 F.3d 545, 555 (D.C. Cir. 2011).  The first and third of these factors certainly favor

the permissibility of some level of force here.  Mr. Fenwick was trying to escape: he admits that

he recognized the individual defendants as law enforcement officers, and both the video and the

Superior Court's findings in his juvenile delinquency adjudication confirm that he was aware of

their desire to stop his flight.  While the deputies' suspicion that Mr. Fenwick was driving a

stolen vehicle would not alone justify the use of deadly force, his maneuvering of that vehicle in a manner that physically endangered an officer might.  Tennessee v. Garner, 471 U.S. at 11; see Brosseau v. Haugen, 543 U.S. at 598.

The second factor therefore is potentially dispositive here, because if Mr. Fenwick clearly posed no "*immediate* threat to the safety of the officers or others," Oberwetter v. Hilliard, 639 F.3d at 555 (emphasis added), then shooting him could be found objectively unreasonable in the circumstances of this case.  See, e.g., Abraham v. Raso, 183 F.3d 279, 294 (3d Cir. 1999) ("A passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect."); Hermiz v. City of Southfield, 484 F. App'x at 16; Cowan ex rel. Estate of Cooper v. Breen, 352 F.3d at 762-63.  In this case, the facts alleged by the plaintiff (and supported by evidence) could support a finding that the deputies' conduct was objectively unreasonable.  As long as factual questions about that matter remain in dispute, a finding of qualified immunity is premature.

In the defendants' view, however, the factual dispute is not *material* — and thus does not preclude summary judgment — because the deputies still are entitled to qualified immunity even if the shooting occurred just as alleged by Mr. Fenwick.  "The fast-moving events," they argue, "did not allow much time for reflection," and "given the danger of the moving vehicle . . . the officers cannot be said to have acted without cause in attempting to defend themselves, by matching Plaintiff's use of deadly force."  Reply at 18.  The defendants rely on decisions in which law enforcement officers making split-second decisions in similarly fast-moving situations were held entitled to qualified immunity because their actions were not objectively unreasonable under the circumstances.  See, e.g., Terrell v. Smith, 668 F.3d 1244 (11th Cir. 2012); Williams v. City of Grosse Pointe Park, 496 F.3d 482 (6th Cir. 2007).  The

defendants contend that the rapid sequence of events — which offered, at best, minimal pause between the onset of Mr. Fenwick's threat to Deputy Pudimott and the cessation of that threat — distinguishes this case from the decisions cited by Mr. Fenwick in which officers used excessive force against a plaintiff well after his menacing or violent behavior ceased and the plaintiff had been subdued.

The events here unfolded quickly: according to the video of the incident, roughly twenty seconds elapse from the moment Mr. Fenwick opens the car door to the point where the car has completely passed by the deputies.  For at least a moment during the encounter with Mr. Fenwick, the deputies had cause to believe that he posed "a threat of serious physical harm" to Deputy Pudimott.  Tennessee v. Garner, 471 U.S. at 11.  Even if a careful retrospective examination yields the conclusion that this threat was gone by the time the deputies shot him, in such a fast-moving situation that conclusion alone would not necessarily mean that "the excessiveness of the force [was] so apparent that no reasonable officer could have believed in the lawfulness of his actions."  Wardlaw v. Pickett, 1 F.3d at 1303.  And the objective reasonableness of the force used "must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight."  Id. (quoting Graham v. Connor, 490 U.S. at 396).  Therefore "the ultimate question is not whether [Deputy Pudimott] really was in danger as a matter of fact, but is instead whether it was objectively reasonable for [the deputies] to believe that [he] was."  Abraham v. Raso, 183 F.3d at 294.

### 3.  Clearly Established Right

With respect to the second prong of the qualified immunity analysis, it was clearly established at the time of this incident that shooting a fleeing suspect who is not presently a danger to anyone, where no other justification for such force presents itself other than the desire

to apprehend the suspect, violates the Constitution.  As the Supreme Court made clear over twenty years earlier in Garner: "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."  Tennessee v. Garner, 471 U.S. at 11.  If the plaintiff's version of events is found to be true — i.e., if Deputies Fischer or Pudimott fired when it was evident that Mr. Fenwick was not at risk of injuring anyone, and if no other considerations called for such extreme force — then a reasonable officer would understand that shooting Mr. Fenwick violated his constitutional rights.  Although Garner is "cast at a high level of generality," Brosseau v. Haugen, 543 U.S. at 599, and although it involved a suspect fleeing on foot who never posed a danger to the officer, clearly established law does not require "a case directly on point," but merely that existing precedent has "placed the statutory or constitutional question beyond debate."  Ashcroft v. al-Kidd, 131 S. Ct. at 2083.  The applicability of Garner's basic lesson to the scenario that Mr. Fenwick alleges is sufficiently obvious that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Brosseau v. Haugen, 543 U.S. at 599 (quoting Saucier v. Katz, 533 U.S. at 202).[9]

Some courts, confronting factual scenarios similar to the one presented here, have reached different outcomes, both as to the existence of a constitutional violation and whether any right violated was clearly established.  E.g., Terrell v. Smith, 668 F.3d at 1250-58.  But as the Supreme Court has observed, "this area is one in which the result depends very much on the facts of each case."  Brosseau v. Haugen, 543 U.S. at 201.  The Court concludes that the defendants are not entitled to summary judgment on Mr. Fenwick's excessive force claims on the basis of

---

[9]     It is not farfetched to suppose that the deputies were cognizant of that lesson — one of them admitted as much in Superior Court, agreeing that under the policies of the Marshal Service, "[t]he only time you can shoot at a fleeing suspect is if that person possessed an eminent [sic] danger of death or serious bodily harm to another person at that point."  Defs.' Sealed Ex. 12 at 129.

qualified immunity.  The pertinent facts surrounding the deputies' conduct must first be resolved

by a jury before that determination can be made.  The same genuine factual dispute also

precludes summary judgment in favor of the defendants on Mr. Fenwick's claims for assault and

battery under the FTCA.  See Arrington v. United States, 473 F.3d at 335-38.


## IV.  CONCLUSION

Because of the existence of genuine issues of material fact requiring resolution by

a jury, the defendants are not entitled to summary judgment on Mr. Fenwick's claims for

excessive force against Deputies Fischer and Pudimott or on his FTCA claims for assault and

battery against the United States.  Collateral estoppel does not preclude Mr. Fenwick from

litigating the issues underlying those claims, because they were not resolved in his juvenile

delinquency adjudication, and Heck v. Humphrey does not bar his claims, because his success

would not imply the invalidity of that adjudication.  Mr. Fenwick, however, will not be permitted

to contest in this Court the factual and legal issues that were decided adversely to him in

Superior Court, identified supra at 20-22.  In addition, his FTCA claim for false imprisonment

and all of his claims against Officer Mickle or based on the conduct of Officer Mickle are

dismissed.

An Order consistent with this Opinion will issue this same day.

SO ORDERED.


/s/_____
PAUL L. FRIEDMAN
DATE:  March 1, 2013                        United States District Judge